IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS VAN BOOVEN II,<br><br>           Plaintiff,<br><br>    vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>           Defendant. | Case No. 1:09-cv-00467-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING THE CLERK OF COURT TO ENTER JUDGMENT FOR PLAINTIFF DOUGLAS VAN BOOVEN AND AGAINST DEFENDANT MICHAEL J. ASTRUE |

**BACKGROUND**

Plaintiff Douglas Van Booven II ("Claimant" or "Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS[1]**

On February 22, 2006, Plaintiff filed applications for DIB and SSI benefits under the Act, alleging disability from March 10, 2004. AR at 97-102. The applications were denied initially and on reconsideration. Id. at 45-60. On May 16, 2008, Plaintiff appeared with counsel and testified before an administrative law judge ("ALJ"). Id. at 19-44. In a decision dated July 24, 2008, the ALJ

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

found that Plaintiff was not disabled within the meaning of the Act. Id. at 8-18. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. Id. at 1-4.

Hearing Testimony

At the administrative hearing, Plaintiff testified that he had an eleventh grade education and had not graduated from high school. AR at 27. He stated that he took some community college courses in the field of chemical dependency. Id.

Plaintiff testified that he worked last as a case manager working with the homeless and substance abusers. AR at 28. Plaintiff indicated that in the past he had worked as a laundry and route driver. See id. at 39. He claimed that he quit working after suffering mini-strokes and a stroke in June 2003. Id. at 28. He stated that he had weakness in his right arm because of a stroke. Id. at 31-32.

Plaintiff reported that he had chronic cryptococcal meningitis. Id. at 29. He claimed that his meningitis affected his head, back, and "whole being." AR at 33. He recounted that the meningitis caused seizures, headaches, blurred vision, fatigue, and short-term memory loss. Id. at 30. Plaintiff reported that his last seizure, prior to the hearing, occurred on February 2, 2008. Id. Plaintiff stated that his driver's license was revoked because of his risk of seizure. Id. He estimated that he suffered headaches every day for the last five years. Id. He claimed that the headaches produced sharp pain that he categorized at an eight on a scale of one to ten. Id. Plaintiff stated that he took methadone for the pain. Id. at 31. He believed that the methadone made his pain "bearable," but reported that the headaches continued. Id.

Plaintiff testified that he had hepatitis C. AR at 28. He reported that his hepatitis C had worsened since his diagnosis in 1998. AR at 31. He claimed that this affliction sapped his energy and he estimated that he slept between twelve and fifteen hours a day. See id. Plaintiff testified that he spent most of his days watching television while lying in bed. AR at 37. He reported that he stopped driving because he lost his license after he passed out behind the wheel of a car. AR at 35. He testified that he lived with his mother and that she drove him to doctors' appointments. Id.

In addition to his physical ailments, Plaintiff testified that he had mental impairments as well.

1  Id. at 34.  In particular, he stated that he had difficulty paying attention and remembering what he
2  was told just five or ten minutes earlier.  Id.
3       Plaintiff estimated that he could sit for two hours a day and stand for one hour a day.  AR at
4  32.  He estimated that he could not lift more than ten pounds or reach above shoulder level with his
5  right arm.  Id. at 33.  He stated that he could not grasp objects for very long because his hands would
6  cramp.  Id.
7       Plaintiff testified that he did not cook, clean or grocery shop.  AR at 35.  He stated that music
8  was his hobby and noted that he played several instruments and was a "published" songwriter.  Id. at
9  36.  He claimed that he gave up his musical endeavors in 2003 after he got sick because he no longer
10 had the strength and ability to play.  Id. at 35-36.  However, in response to questioning from the ALJ,
11 he acknowledged that he worked on a CD that was released in 2006.  Id. at 36.  He claimed that he
12 did the actual work on the CD in 2004.  Id.
13      A vocational expert ("VE"), Linda Ferra, testified.  She classified Plaintiff's past relevant
14 work as that of case aide worker and bus/route driver.  See AR at 38, 40.  She characterized his case
15 aide job as exertionally light and semi-skilled.  Id. at 38.  She categorized the bus driver/route driver
16 jobs as exertionally medium and semi-skilled.  Id. at 40.
17      In his first hypothetical, the ALJ described someone of Plaintiff's age, education and work
18 experience who could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk
19 for six hours in an eight-hour day, and sit for six hours in an eight-hour day.  AR at 40.  In addition,
20 the person could climb ladders, ropes or scaffolds but only occasionally balance.  Id.  The person
21 could stoop, kneel, crouch, crawl and climb ramps and stairs frequently but must avoid concentrated
22 exposure to hazards and was limited to simple, repetitive tasks and limited contact with the public.
23 Id.  In response, the VE opined that a person with this profile could not perform any of Plaintiff's
24 past work.  AR at 40.  However, she believed that such a person could perform other work like
25 housekeeper/cleaner and agricultural produce sorter.  Id. at 41.
26      In a second hypothetical, the ALJ modified his profile to restrict the person to walking and
27 standing for only two hours in an eight-hour day.  AR at 41.  This person was limited to simple,
28 repetitive tasks as well, and would need to be absent from work at least three times a month because

of his condition/impairments. Id. at 42. The VE stated that a person with this profile could perform no work. Id.

Finally, in a third hypothetical, the ALJ described a person of Plaintiff's age, education and work experience who could not maintain attention and concentration consistently through an eight-hour day. AR at 42. The VE stated that a person with this profile could not perform any work. Id.

Medical Record

On March 9, 2004, Dr. N. Wieder, of Kaiser Permanente, examined Plaintiff. At the time, Plaintiff complained of shaking hands and slurred speech since discontinuing cholesterol, anticoagulant, and blood pressure medications two months before. AR at 310. Dr. Wieder diagnosed Plaintiff with transient ischemic attack ("TIA") and ordered a resumption of his medications. Id. Plaintiff returned to Kaiser Permanente on both March 16, 2004, and March 30, 2004, complaining of similar symptoms. Id. at 304-308.

On April 11, 2004, Plaintiff complained of a TIA, related to a 2002 stoke, and demonstrated symptoms of slurred speech and unsteady gait. AR at 282. Plaintiff's hospital course was uneventful, there were no recurrent symptoms, and a CT scan was negative. Id.

An MRI of Plaintiff's brain on April 13, 2004, showed basilar inflammation with abnormal signal and enhancement in the left temporal lobe. AR at 280.  Findings were nonspecific but included infection, granulomatous disease (both infectious and noninfectious), neoplasm (including metastatic disease), and a recommendation for clinical correlation. Id.

Plaintiff went to the ER on May 13, 2004, complaining of "multiple episodes of slurred speech and trembling." AR at 266-68. Plaintiff complained of "chronic frontal headaches," that were "quite bothersome to him." Id. at 268.

Dr. Andrea Goldberg, with the neurology department at the Kaiser Permanente Medical Center, examined Plaintiff and found no aphasia. AR at 267. She noted that testing showed that he could recall two out of three objects after three minutes. AR at 267. In addition, testing revealed abnormal spinal fluid, mild anemia with low hemoglobin, and inflammation in the basilar cisterns and left temporal lob. Id. at 267-68. Although Dr. Goldberg noted Plaintiff's history of stroke and chronic basilar meningitis, she described his examination as "essentially normal" and observed that

he "really appears healthy." AR at 268.

On June 9, 2004, Dr. Stanley Shapiro examined Plaintiff. Again, Plaintiff complained of occasional headaches. AR at 241. However, Dr. Shapiro noted no weakness or slurred speech. Id. Plaintiff returned to Kaiser Permanente in July, September, October, and November of 2004 complaining of similar symptoms. Id. at 223, 217, 441-88.

On October 13, 2004, Plaintiff was admitted to the hospital after claiming to suffer three episodes in the night of slurred speech, leg weakness, trembling, blurred vision, and impaired memory along with headaches. See AR 477-485. Cerebrospinal fluid tests were consistent with a fungal infection/tuberculosis, and his mild encephalopathic changes on an EEG were deemed consistent with an infection. Id. at 455. Plaintiff was readmitted on November 20, 2004, with similar symptoms. See id. at 446-450.

On January 27, 2005, Plaintiff went to the Olive View Medical Center in Los Angeles complaining of continued headaches and poor memory. AR at 428. On February 20, 2005, he returned to Olive View reporting continued headaches. Id. at 424-26. On March 10, 2005, he returned again complaining of continued episodes of slurred speech, difficulty getting up to walk, and shakiness. Id. at 421-23. Dr. Elyse Singer, with the Department of Neurology, told Plaintiff that he should stop driving. Id. at 421. She told him that she would report him to the DMV to prevent him from driving. Id.

On March 24, 2005, Plaintiff told Dr. Singer that he had two seizures that week. AR at 419. She interpreted an EEG as "abnormal" and "suggestive of seizures." Id. In a November 2005 follow-up examination, Plaintiff told Dr. Singer that he had short term memory and sleep problems. AR at 400. However, he told her that since he began taking the drug Keppra he had not experienced any seizures. Id.

In January 2006, Plaintiff told an Olive View psychiatrist, Dr. Saba Syed, that he had moved in with his mother and was doing well and getting into a normal schedule. AR at 394. He reported some sleep problems, which he attributed to his work schedule or pain, but stated that he slept eight hours even still. Id. Plaintiff told Dr. Syed that he played music in a band and believed that things were going well in his life. Id.

In notes from a February 23, 2006 follow-up examination, Dr. Singer described Plaintiff as confused and depressed and noted that he was not taking any anti-depressants. AR at 384. However, during a follow-up psychiatric examination that same day Plaintiff told a different doctor he was in a rock band and felt "good." Id. at 383. He denied suffering symptoms of depression, psychosis or mania. Id. The doctor described Plaintiff as "pleasant," found his mood to be "elevated but not grandiose," and described his thinking as linear and goal-oriented. Id.

In April 2006, Dr. Syed noted that Plaintiff complained of poor sleep. AR at 378. Nevertheless Plaintiff told him he was in a better mood, and was recording an album and had taken his daughter to the recording studio. Id.

In a letter dated May 18, 2006, Dr. Glenn Mathisen, another of Plaintiff's treating doctors at Olive View, recounted Plaintiff's history of treatment at Olive View for chronic meningitis. AR at 374. Due to this condition, Dr. Mathisen believed that Plaintiff had "clearly developed some cognitive deficits and has difficulty with concentration and attention." (AR 374). As a result, he believed that Plaintiff was "unable to work on a full time basis."[2] (AR 374).

On May 20, 2006, Dr. Sarupinder Bhangoo, a consultative internist, examined Plaintiff. Dr. Bhangoo noted Plaintiff's history of seizures and headaches over the preceding two years due to meningitis. AR at 312. In addition, he noted Plaintiff's claims of depression, body aches, and weakness in the limbs since 2004, along with blurred vision, chronic backache, and short term memory loss. Id. at 312-13.

Upon examination, Dr. Bhangoo noted that Plaintiff had a slow gate, a weight of 249 pounds, a height of five feet seven inches, and used a cane. AR at 312-14. Dr. Bhangoo believed that Plaintiff's "mentation at the present time is very clear" and noted that he was able to give a "clearcut history, including timeline of his illnesses." Id. at 315. He observed that Plaintiff did not seem to have any pain. Id.

Based upon his review of the records and his examination, Dr. Bhangoo opined that Plaintiff could lift up to 100 pounds occasionally and 50 pounds frequently; sit, stand and walk eight hours

---

[2] Records show that Dr. Mathisen examined and made several referrals of Plaintiff to various Olive View specialists in 2005 and 2006. See AR at 403-26.

eachin an eight-hour day; did not have any postural or manipulative limitations; and did not have any relevant visual, communicative or workplace environmental limitations.  AR at 315.

On May 20, 2006, Dr. Ina Shalts, a psychiatric consultant, examined Plaintiff.  Plaintiff complained of depression, anger, hopelessness, crying spells, low energy and motivation, and dislike of people.  AR at 318.  Plaintiff told Dr. Shalts that his activities of daily living consisted of watching television, grocery shopping, working on his computer, writing songs, and playing music with friends.  Id. at 320.

Upon examination, Dr. Shalts found Plaintiff to be angry, irritable and depressed, with a flat affect.  AR at 320.  Cognitive testing revealed that Plaintiff indicated a lack of awareness of the current U.S. President, could not spell "world" backwards or interpret proverbs, and had poor concentration.  Id. at 321.

Based on her examination and review of his medical records, Dr. Shalts diagnosed Plaintiff with major depressive disorder, recurrent and without psychosis, seizures, streptococcal meningitis, hepatitis C and a history of stroke in 2003.  AR at 321.  She opined that these impairments caused Plaintiff to have difficulty with social functioning and with concentration, persistence, and pace.  Id.  She believed that he could understand, carry out, and remember simple instructions, but would have difficulty responding to coworkers, supervisors, and the public, and would have difficulty responding to the usual work situation.  Id. at 322.

On June 26, 2006, a non-examining agency consultant, H.T. Unger, evaluated Plaintiff's mental residual function capacity ("RFC")  based on his review of the records.  Dr. Unger opined that Plaintiff was no more than  moderately limited in 20 mental work-related areas of functioning.  See AR at 340-341.  Dr. Unger believed that Plaintiff could perform simple, repetitive tasks on a sustained basis in a usual work setting for a normal day and week.  Id. at 342.

In a "General Assistance Program" report dated August 8, 2006, Dr. Singer affirmed her diagnoses including; status post cryptococcal meningitis, seizures, hepatitis C, and depression.  AR at 344.  She believed that these problems would render Plaintiff unemployable between August 24, 2006 and August 23, 2007.  Id.

In an August 24, 2006 follow up examination with Dr. Singer, Plaintiff reported that he

suffered a seizure two weeks earlier despite complying with his medication regimen. AR at 370. Also, Plaintiff reported continued "constant" headaches, blurred vision, insomnia, and joint aches. Id.

That same day, Plaintiff told an Olive View psychiatrist, Dr. Syed, that he had no motivation and had not been working on his music. AR at 369. However, at an examination one month later, he told Dr. Syed that his mood and sleep were "better," and that he was "hopeful." Id. at 367. In addition, he stated that he was working on a music CD that would soon be released. Id.

On January 18, 2007, a non-examining consultant, Dr. L.V. Bobba, reviewed the record and completed a physical RFC Assessment. He opined that Plaintiff had no exertional limitations, but had postural limitations and should avoid concentrated exposure to hazards. AR at 349-353.

On January 22, 2007, another non-examining consultant, Dr. L.T. Luu, completed a "Case Analysis." He reviewed the record, endorsed Dr. Bobba's findings, and believed that Plaintiff could perform simple, repetitive tasks. AR at 348.

Between January 2007 and May 2008, Plaintiff made several visits to Kern Medical Center complaining of depression, headaches and back pain. See AR at 494-504, 527-53, 572-732.

On February 5, 2007, Dr. Mathisen completed a questionnaire stating that Plaintiff had cognitive problems with memory, headaches and fatigue due to meningitis and a history of seizures. AR at 358. He wrote that Plaintiff could lift up to 20 pounds, sit six hours, stand/walk two hours, and had no limitations on his upper extremities. Id. at 360-61. He believed that Plaintiff could perform low stress work, but would need to take one-to-two unscheduled breaks in an eight-hour workday. Id. at 363. He believed also that if Plaintiff worked he would likely be absent for more than three days each month because of his impairments. Id. at 364.

In October 2007, Dr. Singer noted Plaintiff's history of hepatitis C, meningitis and possible stroke and brain infection, as well as an abnormal EKG. AR at 357. She described his symptoms as including seizures, poor memory, attention, and concentration, ataxia, and chronic headaches. Id. She stated that she reported his seizure condition to the DMV and they revoked his driver's license. Id. She opined that it was "unlikely that he will be able to pursue gainful employment, unless all these problems are resolved." Id.

On February 2, 2008, Plaintiff went to the Kern Medical Center ER complaining of a seizure affecting the right upper extremity and his breathing. AR at 691. Again on March 14, 2008, Plaintiff returned reporting another seizure and continued headaches. AR at 498.

On April 8, 2008, Plaintiff went to Kern Medical Center again, complaining of depression with suicidal ideation. AR at 494. On April 22, 2008, he returned to the ER. A CT scan showed a large, extra axial fluid collection, likely subdural, with improvement in the enlargement of the lateral ventricles with a near complete collapse of the left lateral ventricle. See id. at 660-673. He was diagnosed with a "left subdural hemorrhage-acute on chronic with a ventriculoperitoneal shunt." Id. at 674.

ALJ Findings

First, the ALJ determined that Plaintiff met his insured status requirements through December 31, 2007. AR at 13. Then the ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. He determined first that Plaintiff had not engaged in substantial gainful activity since March 10, 2004. AR at 13. Second, he found that Plaintiff had severe impairments caused by: a history of cryptococcal meningitis, a major depressive order, a history of a seizure disorder, and a history of transient ischemia attacks. Id. Third, the ALJ determined that Plaintiff did not have an impairment, or a combinatin of impairments, that met or exceeded the level required under agency guidelines for presumed disability. Id.

Fourth, the ALJ determined that Plaintiff retained the RFC to lift 20 pounds occasionally and 10 pounds frequently, and to sit, stand and walk, for a total six hours in an eight-hour workday. AR at 14. The ALJ found also that Plaintiff could frequently stoop, crouch, kneel, crawl, and climb ramps and stairs. Id. The ALJ found that Plaintiff could occasionally balance, but he could never climb ladders, ropes, or scaffolds. Id. In addition, the ALJ determined that Plaintiff should avoid concentrated exposure to hazards but could perform simple, repetitive tasks and have limited contact with the general public. Id. at 14-15. Based on these findings, and the testimony of the VE, the ALJ concluded that Plaintiff could not perform his past relevant work. Id. at 16. However, the ALJ concluded that Plaintiff retained the ability to perform significant "light" work in the national economy. Id. at 16-17. As a result, the ALJ determined that Plaintiff was not disabled as defined by

the Act. Id. at 17.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See* Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which include the five-step sequential disability evaluation process described above. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).³ Plaintiff challenges the ALJ's determination at step five of the sequential evaluation process, where his ability to perform other work was assessed based on his RFC. Plaintiff alleges that the ALJ improperly rejected the opinions of two of his treating physicians and an examining psychiatrist without providing specific and legitimate reasons that were based upon substantial evidence in the record. (See Doc. 10 at 15-19).

**DISCUSSION**

1. <u>The ALJ improperly discounted the opinions of two treating doctors and an examining psychiatrist</u>

Plaintiff contends that the ALJ discounted the opinion of two treating experts, Drs. Mathisen and Singer and an examining psychiatrist, Dr. Shalts, without providing specific and legitimate reasons that were based upon substantial evidence in the record.

Dr. Mathisen was employed at the Olive View-UCLA Medical Center and examined Plaintiff on a regular basis between January 2005 and September 2006. See AR at 358, 403-26. During this period, Dr. Mathisen examined Plaintiff and referred him to psychiatric and neurological specialists for treatment. See id. In February 2007, Dr. Mathisen completed a "Multiple Impairment Questionnaire." AR at 358-65. In this document he repeated Plaintiff's diagnoses of cryptococcal meningitis, depression and hepatitis C. Id. at 358. He indicated that these diagnoses were confirmed by clinical tests. Id. at 359. In addition, he believed that Plaintiff suffered "cognitive problems" which he characterized as memory difficulties that he believed resulted from the meningitis. Id. at 358. He believed that Plaintiff's impairments caused his headaches, memory loss and fatigue. Id. at 359. He categorized Plaintiff's pain from these maladies as five on a ten-point scale. Id. at 360.

As a result of these impairments, Dr. Mathisen believed that Plaintiff could lift and carry no more than 20 pounds occasionally and 10 pounds frequently, stand/walk no more than two hours in an eight-hour day, and sit no more than six hours in an eight-hour day. Id. at 360-61. He believed also that the residual effects of Plaintiff's meningitis caused difficulty with concentration and

---

³All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

attention. Id. at 364. In a letter written in May 2006, he opined that these impairment rendered Plaintiff "partially disabled" and precluded him from working on a full-time basis. Id. at 374.

Dr. Singer, a neurologist at Olive View, examined Plaintiff several times in 2005 and 2006. In a letter written in October 2007, she outlined his impairments, in particular meningitis, and noted his frequent complaints of headaches and seizures. AR at 357. She believed also that his impairments caused "poor memory attention and concentration, ataxia and chronic headaches." Id. She believed that it was "unlikely that he will be able to pursue gainful employment, unless all of these problems can be resolved." Id.

Dr. Shalts, an examining psychiatrist, examined Plaintiff in May 2006. She interviewed Plaintiff and performed a mental status examination that included a battery of psychological tests, including tests of his memory, fund of knowledge/information, calculations, concentration, abstract thinking, and similarities and differences. AR at 321. In addition, she recorded a Global Assessment of Functioning ("GAF") score of 50.[4]

Based upon her examination and her review of his medical history, Dr. Shalts concluded that Plaintiff had a major depressive disorder which she characterized as "recurrent, severe without psychotic features." Id. In addition, she concluded that Plaintiff would have "difficulty" with social functioning and concentration, persistence, and pace, but believed that he could "understand, carry out, maintain and remember simple instructions." Id. at 321-22.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. (quoting Murray v. Heckler, 722 F.2d

---

[4] A GAF score of 50 falls within the category of serious symptoms. See Diagnostic and Statistical Manual of Mental Impairments, 4th text revision, 2000, p 34 ("DSM-IV). Serious symptoms (41-50) include "(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

499, 502 (9th Cir. 1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). Likewise, the opinions of an examining doctor may be discounted only for specific and legitimate reasons. Moore v. Commissioner, 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester, 81 F.3d at 830-31). The ALJ must do more than offer his conclusions. He must set forth his own interpretation and explain why they, rather than the doctor's, are correct. Embry v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988). Finally, the opinion of specialist opining in her particular field of expertise is entitled to greater weight than the opinion of a non-specialist. 20 C.F.R. § 404.1527(d)(5).

In rejecting Dr. Mathisen's opinion, the ALJ stated simply that it was in conflict with the opinion of a one-time, examining internist, Dr. Bhangoo, and it was based on a finding of "partially disabled" which has no significance in the context of determining disability under social security regulations. AR at 15. Beyond this, the ALJ offers no other reason for rejecting Dr. Mathisen's opinion. In doing so, he rejected implicitly the lengthy questionnaire completed by Dr. Mathisen that outlined the specific physical and cognitive deficits that hindered Plaintiff's ability to work full-time and addressed areas of functioning directly relevant to criteria for determining disability under agency standards. See AR at 358-65.

The ALJ's rejection of Dr. Shalts' opinion is similarly brief. He noted an inconsistency with Dr. Bhangoo's findings and stated that Dr. Shalts' opinion was contradicted by Plaintiff's daily activities, including his work on a music CD in 2006. See AR at 15.

Though Dr. Bhangoo found no physical restrictions prevented Plaintiff from working, the existence of physical restrictions was not central to the conclusion of Drs. Mathisen or Shalts' that Plaintiff suffered disabling impairments due to neurological, cognitive and psychological deficits. On the question of Plaintiff's ability to function in light of his neurological and psychological problems, Dr. Bhangoo proffered no opinion beyond a one sentence observation that Plaintiff's "mentation" seemed clear in that he answered all questions during the examination appropriately. Dr. Bhangoo's opinion, to the extent it addressed the severity of Plaintiff's cognitive and neurological impairments, was not based on any testing, nor did he offer any opinion as to the impact

these impairments might have on Plaintiff's ability to maintain concentration, persistence and pace in the work setting. For these reasons, the Court concludes that Dr. Bhangoo's conclusory and unsupported remark about Plaintiff's "mentation," does not amount to substantial evidence sufficient to provide a specific and legitimate basis for discounting the opinions of the treating doctors and the examining psychiatrist.

On the other hand, Dr. Shalts performed a mental status examination of Plaintiff that included a battery of tests in a wide range of cognitive areas of functioning. See AR at 320-21. Based on her examination and her review of Plaintiff's medical record, she concluded that Plaintiff had major depressive disorder and seizures resulting from his meningitis. See id. She found that these problems caused particular difficulty in his ability to maintain concentration, persistence and pace and function with co-workers, supervisors and the public. Id. at 321-22. Although she offered no specific opinion on Plaintiff's ability to work, in a hypothetical posed to the VE containing restrictions on concentration, persistence and pace "over the course of an eight-hour day," the VE opined that such a person could not perform any full-time work. Id. at 42. The ALJ did not adopt this restriction in his RFC finding.

Also, the ALJ believed that Dr. Singer's opinion should be discounted also because it was based upon a definition of "disability" used by a county-sponsored benefit program that he believed differed from that required for Social Security benefits.[5] Id. at 16. Even if true, this is not, without more, a legitimate basis for rejecting their opinions out of hand.

However, review of the medical records show that Plaintiff had a long history of frequent treatment beginning in 2003 for seizures, headaches, and memory loss related to his TIA condition. Notes from Dr. Singer indicate that her opinion was based on her physical examinations of Plaintiff and objective testing and not just Plaintiff's subjective complaints. See AR at 357, 419, 421. For instance, she cites an "abnormal" EKG which she believes is suggestive of a condition which causes seizures. Id. at 357, 419. Dr. Singer believed that this impacted Plaintiff's ability to work because it impacted his ability to maintain memory, attention and concentration, which are criteria directly

---

[5] The ALJ did not explain the basis for this contention.

relevant to a determination of disability under agency guidelines. See AR at 357, 400, 419, 420-21. In addition, treatment notes from March 2005 indicate that she administered two memory tests which revealed deficiencies in that area of cognitive functioning. See id. at 421. She was so concerned about Plaintiff's condition, in particular his frequent seizures, that she contacted the DMV to have his driver's license revoked. Id. at 357, 421.

Finally, the ALJ appears to have based his determination of non-disability in part on his belief that Plaintiff's symptom testimony was not credible. See AR at 16. He cited Plaintiff's musical activities, in particular, the fact that he was working on a CD in 2006, as evidence both that his testimony was not credible and to discount Dr. Shalts's opinion because the ALJ believed this conduct indicated a level of activity inconsistent with disability. Id. at 15. Plaintiff has not challenged this credibility determination on appeal.

The Court acknowledges that evidence in the record supports the ALJ's determination that Plaintiff's testimony was not credible. At the hearing, Plaintiff stated that his impairments rendered him incapable of playing music since 2003. AR at 36. Yet, evidence in the record refutes this assertion. In particular, the ALJ noted that Plaintiff worked on a CD in 2006 and took his daughter with him to the recording studio. Id. When confronted with this information, Plaintiff backtracked and argued that he did not receive money for his efforts, but admitted that he had engaged in this conduct, albeit in 2004. Id.

Plaintiff's hearing testimony suggests a level of daily activities that is inconsistent with his testimony and agency guidelines for disability. See AR at 35-37 (testifying he didn't cook, clean or shop for groceries, no longer had the strength to play musical instruments and spent a typical day watching television and laying in bed). Plaintiff argues that the fact that he may have gone to the studio on one occasion to record a CD does not speak to his functional capacity and suggests that this incident was isolated. (Doc. 10 at 19). While this might be true, the record suggests other times when Plaintiff engaged in these activities, given his repeated report to medical personnel of his ongoing musical career. See id. at 367, 383. Nevertheless, isolated incidents of such activity, without more, are insufficient to warrant discounting the opinion of Dr. Shalts. See Reddick, 157 F.3d at 722 (stating that sporadic activities punctuated with rest are not inconsistent with disability

and that claimants should not be "penalized for attempting to maintain some sense of normalcy" in their lives or "vegetate in a dark room" in order to be eligible for benefits).

Where an ALJ has provided a proper basis for discounting a claimant's subjective symptom testimony, he may discount the opinions of treating or examining experts that are based *primarily* on such testimony. Thomas v. Barnhart, 278 F.3d 948, 957 (9th Cir. 2002); Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989). However, here as described above, Dr. Shalts's opinion, and the opinions of the treating sources, was based on their evaluation of objective criteria and not just Plaintiff's subjective complaints.

In an attempt to bolster the ALJ's decision, Defendant asserts that the opinions of two non-examining consultants support the decision to discount the opinions of Drs. Singer, Mathisen and Shalts. (Doc. 11 at 10). Although the ALJ cited the opinions of these non-examining consultants to support his decision to deny benefits, see AR at 16, he did not cite these opinions as a basis for discounting the opinions of the treating doctors or Dr. Shalts. Even still, the opinion of a non-treating, non-examining consultant, without other substantial evidence, is an insufficient basis for discounting the opinions of treating or examining experts. See Lester, 81 F.3d at 831; see also Ryan v. Commissioner, 528 F.3d 1194, 1202 (9th Cir. 2008).

The brief and conclusory reasons cited by the ALJ to reject the evidence from these doctors do not meet the ALJ's obligation to explain his rationale. See Magallanes, 881 F.2d at 751 (the ALJ can meet his burden to explain his decision to reject evidence by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings"). Therefore, the Court concludes that the ALJ failed to provide specific and legitimate reasons based upon substantial evidence for discounting the opinions of the treating physicians or the examining psychiatrist and will remand the matter. In doing so, the Court does not conclude that the record is devoid of evidence which could provide a basis for rejecting the opinions of the two treating doctors or Dr. Shalts. The Court notes simply that the specific reasons proffered by the ALJ were insufficient.

On a related note, the Court notes that Defendant has attached numerous exhibits, not included in the administrative record, to rebut Plaintiff's assertions that his musical endeavors were

isolated and insubstantial.  This documentation indicates that Plaintiff has engaged in a significant level of professional musical work since his alleged disability onset date of March 10, 2004.  For instance, in the summer of 2005, Plaintiff appears to have been on a multi-month concert tour involving numerous performances.  (See Doc. 11-4 at 2-6).  The exhibits indicate also that Plaintiff has worked as a backing musician in the production of CDs and albums of other musical artists and show that he performed in concerts in 2004 and 2008.  (See Doc. 11-1, 11-2, 11-3, and 11-5).  His facebook page from December 2008 reveals an active and multi-instrumented musical career under the self-described moniker of "Douglas 'Groovin' Van Booven."  (See Doc. 11-6).

Plaintiff asserts that consideration of this "new evidence" on appeal is inappropriate because it is not relevant to the issue of disability and Defendant has not presented "good cause" for failing to present this evidence during administrative proceedings.  (Doc. 12 at 2).  At this stage, the Court cannot conclude that the evidence is irrelevant.  Evidence of an extensive professional musical career involving significant travel and numerous concert and recording dates, at the very least, raises legitimate questions as to the level of Plaintiff's functional capacity and arguably is at odds with his claims of disabling pain, headaches, memory loss, and seizures.  This evidence is also inconsistent with his testimony that because of the severity of his symptoms he rarely leaves the house and spends most of his time lying in bed and watching television. Furthermore, it appears that some of this "new" evidence may involve conduct that occurred after Plaintiff's administrative hearing and, thus, could not have been presented during administrative proceedings.

Moreover, it appears that Defendant's motivation to present this evidence is to rebut Plaintiff's implicit argument on appeal that his musical endeavors have been isolated and sporadic and do not have a bearing on his level of functioning.  (See Doc. 10 at 19).  Under these circumstances, where significant new evidence affecting the case is presented on judicial appeal, the proper recourse is to remand to the Commissioner for further consideration.  See Bruton v. Massanari, 268 F.3d 824, 827 (9th Cir. 2001); 42 U.S.C. § 405(g); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (holding that, among other things, evidence of activities inconsistent with disability is a legitimate basis for discounting the opinions of treating or examining doctors).

///

2. <u>Remand for further proceedings is appropriate</u>

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate repayment of benefits is within the discretion of the district court. <u>Harman v. Apfel</u>, 211 F.3 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 886 (9th Cir. 2004) (citing <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. <u>Varney v. Secretary of Health and Human Services</u>, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because the Court concludes that the ALJ failed to provide specific and legitimate reasons for discounting the opinions of two treating doctors and an examining psychiatrist, and because the Court believes that evidence concerning Plaintiff's level of functioning, including new evidence not presented to the agency, could impact Plaintiff's eligibility for benefits, the Court will order the matter remanded for further proceedings. <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply award benefits is within the discretion of the court).

**CONCLUSION**

Based on the foregoing, this matter is HEREBY REMANDED for further proceedings consistent with this decision. The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated:   **September 7, 2010**                                    /s/ Jennifer L. Thurston
                                                                    UNITED STATES MAGISTRATE JUDGE